**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WALTER DICASTANADO** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  21-4386** |
| | : | |
| **KILOLO KIJAKAZI, ACTING** | : | |
| **COMMISSIONER, SOCIAL** | : | |
| **SECURITY ADMINISTRATION** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                   **June 28, 2022**

Walter Dicastanado requests our review of the Commissioner of the Social Security Administration's denial of his application for Social Security Disability Benefits after a hearing and reasoned decision from an administrative law judge. Judge Heffley recommended we deny Mr. Dicastanado's request for review. Mr. Dicastanado objects to Judge Heffley's recommendation arguing she erred by: (1) affirming the administrative law judge's finding regarding his left upper extremity limitations; (2) affirming the administrative law judge's finding his anxiety disorder is a non-severe impairment; and (3) finding he lacked standing to raise a constitutional challenge based upon the Supreme Court's recent opinions in *Seila Law LLC v. Consumer Financial Protection Bureau*[1] and *Collins v. Yellen*.[2] We studied the record and independently reviewed the legal issues including his interpretation of Supreme Court guidance regarding the removal of a Commissioner when the removal has nothing to do with an administrative law judge's hearing and reasoned decision and thus not affecting Mr. Dicastanado. Mr. Dicastanado does not persuade us.  We overrule Mr. Dicastanado's objections, adopt Judge Heffley's detailed report and recommendation, and deny his request for review.

## I.  Background

Then forty-five year old Walter Dicastanado fell off a ladder in October 2018 while working as an airplane fueler, injuring his left shoulder, left scapula, and left side of his neck.[3] His job required him to lift and carry 100 or more pounds.[4] He applied for Social Security Disability Insurance Benefits on July 3, 2019 based on bilateral carpal tunnel syndrome, neck herniation, muscle atrophy, cervical herniation, and diabetes.[5]

The Commissioner of the Social Security Administration denied Mr. Dicastanado's initial claim for disability benefits.[6] Mr. Dicastanado requested reconsideration.[7] The Social Security Administration on reconsideration affirmed its original denial of disability benefits after an independent review by a physician and disability examiner in the State agency, consideration of medical evidence, and additional information received since the initial decision.[8]

Mr. Dicastanado requested a hearing before an Administrative Law Judge.[9] Administrative Law Judge Nycole Watson held a hearing on October 9, 2020 on the denial of disability benefits on initial review and reconsideration.[10] Attorney Adam Taylor represented Mr. Dicastanado. Mr. Dicastanado and vocational expert Christina Beatty-Cody testified.[11] Judge Watson issued an opinion twenty days later finding Mr. Dicastanado not disabled.[12]

### Administrative Law Judge Watson denied benefits citing substantial evidence.

Judge Watson denied Mr. Dicastanado's appeal for disability benefits. She found Mr. Dicastanado has the residual functional capacity to perform a limited range of sedentary work.[13]

The Social Security Administration employs a five-step sequential evaluation process for determining disability under the Social Security Act.[14] At the first step, the judge considers whether the claimant is engaged in substantial gainful activity as defined by the Social Security regulations.[15] If the claimant engages in substantial gainful activity, he is not disabled regardless

of the severity of his physical or mental impairments and regardless of age, education, and work experience. If the claimant is not engaging in substantial gainful activity, the analysis proceeds to the second step. Judge Watson found Mr. Dicastanado has not engaged in substantial gainful activity since October 19, 2018.[16]

At the second step, the judge considers the medical severity of a claimant's impairment.[17] If a claimant does not "have any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities," a claimant is not disabled.[18] "The step-two inquiry is a *de minimis* screening device to dispose of groundless claims."[19] "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'"[20] If the evidence shows more than a "slight abnormality," the  "step-two requirement of 'severe' is met, and the sequential evaluation process should continue."[21] Judge Watson found at the second step Mr. Dicastanado had severe impairments from disorders of the spine and degenerative joint disease.[22] Judge Watson reviewed Mr. Dicastanado's other impairments: diabetes, hypertension, carpal tunnel syndrome, vision disorder, anxiety disorder, and problems paying attention and completing tasks.[23] Judge Watson found these impairments are non-severe or not medically determinable, explaining these other conditions have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to last at a "severe" level for a continuous twelve-month period, are not expected to result in death, and/or have not been properly diagnosed by an acceptable medical source.[24]

At the third step, the judge must determine whether the claimant's impairment or combination of impairments is of a severity to meet, or medically equal, the criteria of impairments

listed in the Social Security regulations.[25] If the claimant's impairments match a listed impairment, the claimant is presumed disabled.[26] If the claimant's impairments do not match impairments on the list, the judge moves to step four to determine the claimant's residual functional capacity.[27] Judge Watson found Mr. Dicastanado does not have an impairment or combination of impairments meeting or medically equal to the severity of a listed impairment.[28]

At the fourth step, the judge must determine a claimant's residual functional capacity based on the record.[29] The judge considers whether the claimant has a residual functional capacity to perform the requirements of past relevant work experience. The claimant is not disabled if he has a residual functional capacity to perform past relevant work.[30] Judge Watson found Mr. Dicastanado is unable to perform any past relevant work but found he retained the residual functional capacity to perform sedentary work subject to certain limitations.[31]

At step five, if the claimant is unable to return to past work, the judge must determine whether the claimant's impairment precludes him from adjusting to other work ranging from sedentary work to very heavy work.[32] Judge Watson found Mr. Dicastanado is unable to perform his past work.[33] She found Mr. Dicastanado's limitations impeded his ability to perform all or substantially all of the requirements of the full range of sedentary work.[34] To determine the extent to which his limitations eroded the unskilled sedentary occupational base, Judge Watson asked Vocational Expert Beatty-Cody whether there are jobs in the national economy for an individual of Mr. Dicastanado's age, education, work experience, and residual functional capacity.[35] Vocational Expert Beatty-Cody identified three occupations: document preparer, sorter, and stuffer.[36] Judge Watson evaluated Vocational Expert Beatty-Cody's testimony and concluded Mr. Dicastanado is capable of making a successful adjustment to other work existing in significant numbers in the national economy and found him "not disabled."[37]

4

Mr. Dicastanado appealed Judge Watson's finding to the Appeals Council.[38] The Appeals Council affirmed.[39]

### *Judge Heffley's report and recommendation we deny the request for review..*

Mr. Dicastanado sued challenging the denial of benefits.[40]  He claims Administrative Law Judge Watson erred by: (1) finding he can use his left upper extremity without limitation for handling, fingering, feeling, and reaching in all directions other than overhead; and (2) failing to include mental limitations in the residual functional capacity determination.[41] Mr. Dicastanado also argued the Commissioner's decision is invalid under the Supreme Court's recent decision in *Seila Law LLC v. Consumer Financial Protection Bureau.*[42]

Judge Heffley found substantial evidence to support Judge Watson's finding Mr. Dicastanado's left extremity is limited only in his ability to reach overhead and the finding Mr. Dicastanado's anxiety disorder is a non-severe impairment.[43] Judge Heffley found Mr. Dicastanado did not have standing to assert a constitutional claim.[44] Judge Heffley recommended we deny Mr. Dicastanado's request for review.[45] Mr. Dicastanado objects to Judge Heffley's report and recommendation.[46]

## II.  Analysis

We review *de novo* the objected portions of Judge Heffley's report and recommendation.[47] We "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."[48] Our *de novo* review of Administrative Law Judge Watson's findings of fact is limited to whether substantial evidence supports her decision.[49] We are bound by Judge Watson's findings of fact if they are supported by substantial evidence.[50] "Substantial evidence" is a "'term of art' used throughout administrative law to describe how courts are to review agency factfinding."[51] "Under the substantial-evidence standard, a court looks to an existing

administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."[52] The threshold for the sufficiency of evidence is "not high"; it is "more than a mere scintilla" and "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[53]

We must rely on the record developed during the administrative process and the pleadings.[54] We may not weigh evidence or substitute our own conclusions for those of Judge Watson and we must defer to her "evaluation of evidence, assessment of the witnesses, and reconciliation of conflicting expert opinions."[55] But Judge Watson must provide sufficient detail to permit us to meaningfully review her decision.[56] She must consider all evidence and, where there is a conflict in the evidence, may chose whom to credit but may not "reject evidence for no reason of for the wrong reason."[57]

### A. Administrative Law Judge Watson did not err in finding Mr. Dicastanado's left upper extremity reaching limitation applied only to overhead reaching when determining his residual functional capacity.

Mr. Dicastanado objects to Judge Watson's finding he has the residual functional capacity to perform sedentary work, subject to certain limitations, based on her finding he can "occasionally reach overhead with the left upper extremity"[58] without including limitations in his ability to use his left upper extremity for non-overhead reaching, handling, fingering, or feeling.[59]

Step four of the sequential evaluation for determining disability requires the administrative law judge to determine whether a claimant's residual functional capacity enables him to perform his past relevant work. "'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[60] An administrative law judge may weigh the credibility of evidence but "must give some indication of the evidence which [she] rejects and [her] reason(s) for discounting such evidence."[61]

6

Administrative Law Judge Watson found Mr. Dicastanado had the residual functional capacity to perform sedentary work with the following limitations:

> "he is able to occasionally lift ten pounds, frequently lift and/or carry five pounds; stand and/or walk for a total of about two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally push/pull; perform occasional postural maneuvers, but never climb ladders, climb ropes, climb scaffolds, or crawl; occasionally reach overhead with the left upper extremity; frequently operate foot controls with the left lower extremity; cannot read very small print, but can avoid hazards, read ordinary newspaper or book print, and determine the difference between sizes and shapes; and should avoid concentrated exposure to hazardous machinery, unprotected heights, and vibration."[62]

Mr. Dicastanado contends Judge Watson's residual functional capacity determination "greatly overstates" his abilities and is not supported by substantial evidence. He objects to Judge Heffley's assessment of Judge Watson's residual functional capacity finding is supported by substantial evidence.

Mr. Dicastanado identifies multiple errors in Judge Heffley's report and recommendation and Judge Watson's decision. We view these in three categories: (1) Mr. Dicastanado's reported limitations in his September 2019 Function Report; (2) the opinion of consultative examiner Saeed Bazel, M.D. and the reports of two orthopedic surgeons, a pain management specialist, and primary care nurse practitioner consistent with Dr. Bazel's opinion; and (3) an "inappropriate statement" made by Judge Watson.

### 1. Administrative Law Judge Watson addressed Mr. Dicastanado's Function Report and testimony.

Mr. Dicastanado contends Administrative Law Judge Watson unfairly represented his October 9, 2020 hearing testimony describing his abilities in light of his September 6, 2019 Function Report reporting problems with washing.

Mr. Dicastanado testified at the October 9, 2020 hearing. He swore he is able to take showers, heat food in the microwave, drive twice per week, dress and groom himself, and post on

social media.[63] Mr. Dicastanado reported having problems washing in a September 6, 2019 Function Report.[64] Mr. Dicastanado contends Administrative Law Judge Watson ignored the Function Report noting he has problems with washing, making meals, and doing other housework when he specifically noted he does not prepare meals because of his limited ability to reach, bend, grab, and hold items and has difficulties dressing, grooming, and using the toilet because of his limited ability to reach, grab, hold, and grip.[65]

We disagree Judge Watson and Judge Heffley "failed to mention" his Function Report. Judge Watson specifically referred to the Function Report where Mr. Dicastanado indicated he had problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing (stairs), completing tasks, and using his hands.[66] She then referred to the October 2020 hearing where Mr. Dicastanado testified: he has pain in his feet, neck, back and left arm, is able only walk six minutes, sit ten minutes, and stand ten to twelve minutes, lift and carry five pounds, but can bathe independently, dress and groom himself, heat up food in the microwave, and drive to run errands.[67] This is Mr. Dicastanado's sworn testimony. He disagrees with Judge Watson's understanding of his testimony. Judge Watson considered his statements about his symptoms, pain, and how his symptoms affect his activities of daily living as required by the regulations.[68] She mentioned both the Function Report and the hearing testimony.[69] We overrule this objection.

### 2. Judge Watson considered Dr. Bazel's report and the reports of other medical providers, discussed all the medical evidence, and explained her reasoning in making her residual functional capacity finding.

Mr. Dicastanado next argues Administrative Law Judge Watson ignored his Function Report listing difficulties in dressing and personal care as consistent with Dr. Bazel's opinion of limited use of the left upper extremity, including diminished arm and grip strength and hand and finger dexterity and failed to consider other medical evidence, including the reports of two

orthopedic surgeons, a pain management specialist, and a primary care nurse practitioner consistent with Dr. Bazel's opinion.[70]

We find no basis for this argument. Judge Watson considered all the medical evidence, including the opinions of orthopedic specialists Todd Schwartz, D.O. and Richard Mandel, M.D., his pain management specialist Huagnuang Qu, M.D., and nurse practitioner Tenzin Dechen at Mercy Medical Associates.[71] Mr. Dicastanado is also incorrect Judge Heffley failed to address his objection to Judge Watson's failure to consider the evidence from multiple treating sources. Judge Heffley specifically addressed and rejected his argument finding it an attempt by Mr. Dicastanado to have the court reweigh evidence *de novo* which we may not do.[72]

Our concern is whether there is substantial evidence for Judge Watson's residual functional capacity finding. We conclude there is. Judge Watson reviewed the medical record, including an October 30, 2019  internal medical consultative examination by Dr. Bazel, M.D.[73] Judge Watson recognized Dr. Bazel's examination included a finding of "muscle atrophy in the entire left upper extremity as measured"'; "[h]and and finger dexterity are barely completed on the left side. He can barely make a fist, but it is painful, causes pain in the hand, wrist, and running over the medial aspect of the left forearm all the way up to the neck area. Grip strength is 5/5 on the right hand and 1/5 on the left. He does not have even ability to tie his shoelaces, but he can zip and button with the right hand"; and diagnosed "[s]evere neck pain with significant radiculopathy causing muscle weakness and atrophy on the left side of the body"; "[s]evere left shoulder chronic pain due to rotator cuff injury"; "[u]pper and mid-back chronic pain"; "[s]evere weakness of the left arm and left leg"; "[b]ilateral carpal tunnel syndrome"; diabetes; hypertension; "[d]iminishing of visual acuity."[74]

Judge Watson also observed Mr. Dicastanado presented with normal stance, no assistive device, ability to rise from a chair without difficulty, negative straight leg raise, no evidence of joint deformity, stable/non-tender joints, intact deep tendon reflexes, intact sensation to light touch, 5/5 strength in the right upper and lower extremities, 5/5 grip strength on the right, and the ability to zip and button with the right hand, as well as normal range of motion of the right elbow, writs, knee, ankle, hand, and left hand.[75]

Judge Watson reviewed Dr. Schwartz's evaluation.[76] She recognized Dr. Schwartz's findings on physical examination of moderate distress and decreased range of motion of the left shoulder but found Dr. Schwartz's examination also revealed negative Spurling's sign,[77] symmetric deep tendon reflexes, negative drop arm test, and full range of motion of the elbow, wrist, and hand, and negative Speed's/Yergason's tests.[78] An x-ray of the left shoulder did not reveal an osseous pathology.[79] Dr. Schwartz administered an injunction to the left rotator cuff region and advised to continue with therapy and medication and additional  diagnostic imaging.[80] Judge Watson recognized MRI imaging of the cervical spine showed disc degeneration with diffuse disc herniation on the left C5-6 and other cervical regions and an MRI of the left should showed joint arthritis, rotator cuff tendinosis, but no evidence of rotator cuff tear.[81]

She recognized Mr. Dicastanado's treatment with a chiropractor and Dr. Qu for pain management.[82] She recognized Mr. Dicastanado's treatment records from Worknet Occupational Medicine, Mercy Medical Associates, and Dr. Mandel, and administrative medical findings at the initial and reconsideration level by Dr. Brown and Dr. Ritner.[83] Judge Watson noted both Dr. Mandel and Dr. Qu both noted Mr. Dicastanado could not return to his pre-injury work status but neither provided any specific work restrictions and explained it is not necessary to evaluate this evidence for persuasiveness.[84]

Judge Watson considered this evidence along with Dr. Bazel's consultative examination. She concluded Mr. Dicastanado's medically determinable impairments could reasonably be expected to cause his symptoms, but his statements about the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record.[85] She accepted Mr. Dicastanado's statements as to his condition only to the extent as they can be reasonably be accepted as consistent with the objective evidence.[86] She found all the evidence supported a reduced range of sedentary work.[87]

Judge Watson also considered the non-severe impairments in assessing Mr. Dicastanado's residual functional capacity.[88] She considered Dr. Bazel's opinion regarding Mr. Dicastanado's carpal tunnel syndrome, noting deficits in the left extremity.[89] She found Dr. Bazel's opinion "somewhat persuasive" as supported by Dr. Bazel's examination and consistent with the record as a whole.[90] Judge Watson concluded because the carpal tunnel syndrome is non-severe based on her findings at step two, she concluded at step four Mr. Dicastanado does not have limitations on handling, fingering, or feeling.[91]

Mr. Dicastanado objected to Judge Watson's finding at step two his carpal tunnel syndrome is non-severe. Judge Heffley disagreed, reviewing all the evidence supporting Judge Watson's finding with regard to carpal tunnel syndrome.[92] Judge Heffley found, even if Judge Watson erred at step two with regard to the carpel tunnel syndrome, it is harmless error because Judge Watson proceeded to step four and considered all non-severe impairments. An error at step two does not "not alter the remainder of the five-step process, much less the overall outcome. And without more, [claimant] provides no valid basis for remand."[93]

Judge Watson recognized all the medical and non-medical evidence in the record. She explained the reasons for her residual functional capacity assessment. She considered all the

evidence before her and wrote a thorough opinion explaining why she gave weight to some evidence while discounting other evidence. She explained why she discounted Mr. Dicastanado's subjective reports. While "'any statements of the individual concerning his ... symptoms must be carefully considered,' ...  the [administrative law judge] is not required to credit them."[94] Mr. Dicastanado's objections ask us to reweigh evidence. We will not do so where the administrative law judge's decision is supported by substantial evidence. We overrule Mr. Dicastanado's objection.

### 3. The record does not support Mr. Dicastanado's objection to Judge Watson's alleged "inappropriate statement" regarding referred treatment.

Mr. Dicastanado objects to an "inappropriate statement" he contends Judge Watson made in her decision regarding the availability of low cost or no cost medical treatment in Philadelphia.[95] He also contends Judge Heffley failed to consider his objection to this "inappropriate statement."[96]

Judge Watson found Mr. Dicastanado has the residual functional capacity to perform sedentary work with limitations. Judge Watson's analysis of medical records noted treatment records from Mercy Medical Associates, including prescribed medication for chronic pain beginning in September 2019.[97] She noted the provider at Mercy Medical Associates made referrals for physical therapy, updated diagnostic imaging, pain management, and a neurosurgical evaluation but "the record does not reveal any additional treatment or imaging pursuant to those referrals, despite indications in the treatment records from Mercy Medical Associates [Mr. Dicastanado] had medical insurance."[98] In the next sentence she noted: "there are multiple clinical facilities in the City of Philadelphia who provide no cost and low cost medical treatment."[99]

Mr. Dicastanado objects to this statement as inappropriate because it shows Judge Watson drew a negative inference about his description of his pain and dysfunction from his lack of consistent treatment.[100] He argues this statement violates Social Security Ruling 16-3p providing

the Commissioner "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."[101] One of the possible reasons to consider is a claimant's inability to afford treatment and possible lack of access to free or low-cost medical service. He attributes error to Judge Watson's failure to ask whether he had access to the physical therapy, updated diagnostic imaging, pain management, and neurological evaluation as referred by Mercy Medical Associates. He contends he treated with a chiropractor over seventy times over a seven month period but stopped treatment because he no longer had health insurance. He argues Judge Watson erred by relying on his failure to obtain the treatment as referred by Mercy Medical Associates to improperly discount his reported pain.

Our study of the record does not support Mr. Dicastanado's argument. The record shows Mr. Dicastanado treated with a chiropractor between November 1, 2018 to June 6, 2019.[102] The provider noted at a November 8, 2019 office visit with Mercy Medical Associates: "No more chiropractor – 'insurance not covering.'"[103] Mercy Medical Associates' treatment notes from September 11, 2019 and November 9, 2019 visit show referrals for additional treatment, imaging, and evaluation.[104] Mr. Dicastanado had insurance at this time. There is no basis in the record allowing us to find Mr. Dicastanado followed up with Mercy Medical Associates' recommendations and referrals at a time when he had insurance coverage. This objection again goes to the issue of weight assigned by Judge Watson to the record before her. Our job is to review the administrative law judge's factual findings for "substantial evidence," not to re-weigh evidence or substitute our own factual determinations.[105] We overrule Mr. Dicastanado's objection.

**B. Administrative Law Judge Watson's finding Mr. Dicastanado's anxiety disorder is a non-severe impairment is supported by substantial evidence.**

Administrative Law Judge Watson found Mr. Dicastanado suffered from a medically determinable impairment of anxiety disorder at step two of the sequential evaluation. But Judge Watson concluded the anxiety disorder is non-severe because it does not cause more than minimal limitation in Mr. Dicastanado's ability to perform basic mental work activities.[106] Mr. Dicastanado objects to Judge Watson's assessment, arguing she failed to engage in a full or proper evaluation of the record evidence. He argues the record supports a finding his anxiety disorder would have impacted his ability to perform sustained work and Judge Watson erred in failing to include his mental limitations in the residual functional capacity.

The administrative law judge is required at step two of the sequential evaluation to determine whether the claimant has a "severe" medically determinable impairment or a combination of impairments.[107] The Commissioner employs a special technique to evaluate the severity of mental impairments.[108] If the administrative law judge determines a claimant's "symptoms, signs, and laboratory findings" support the existence of a medically determinable impairment, the administrative law judge must assess the claimant's limitations in four functional areas to determine whether the impairment is "severe."[109] The four functional areas used by the administrative law judge to rate the degree of a claimant's functional limitation are: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."[110] The administrative law judge then applies a five-point scale to determine the degree of limitation: "[n]one, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."[111] If the administrative law judge rates the degree of limitation as "none" or "mild," she will "generally conclude that [claimant's] impairment(s) is not severe, unless the evidence

14

otherwise indicates that there is more than a minimal limitation in [claimant's] ability to do basic work activities."[112] An administrative law judge's written decision "must incorporate the pertinent findings and conclusions based on the technique" including a specific finding as to the degree of limitation in each of the four functional areas.[113]

Administrative Law Judge Watson considered the functional areas of mental functioning in the disability regulations for evaluating mental disorders and the Listing of Impairments.[114] Judge Watson rated Mr. Dicastanado's mental impairment of anxiety disorder "mild" and the evidence did not otherwise indicate more than a minimal limitation in his ability to do basic work activities.[115] Judge Watson considered the four functional areas in the context of the record before her in reaching this finding. She recognized Mr. Dicastanado reported problems paying attention and completing tasks, his treating physician prescribed medication for anxiety which is described as under "fair control," but the record did not show any formal mental health treatment since the onset date of disability such as psychiatric medication management, individual counseling, psychiatric hospitalization, intensive outpatient programs, partial hospitalization programs, or crisis interventions.[116] Judge Watson recognized while clinical examination records show some reports of an anxious or depressed mood, the record also showed findings of good insight, good judgment, and normal memory and the records, as a whole, do not support any mental limitation.[117]

Judge Heffley recommends we deny Mr. Dicastanado's request for review on the anxiety disorder issue. Judge Heffley concluded Administrative Law Judge Watson's findings are supported by substantial evidence and Mr. Dicastanado's argument asks us to weigh the evidence which we are not permitted to do. Judge Heffley also concluded even if Judge Watson erred in determining Mr. Dicastanado's anxiety disorder non-severe, it is harmless error because Judge

Watson proceeded through the later steps of the sequential analysis and considered the combined effects of all impairments – severe or non-severe – in the residual functional capacity analysis.[118]

Mr. Dicastanado objects to Judge Heffley's report and recommendation claiming: (1) she relied on portions of the record not relied on by Judge Watson and relied on her own "lay opinion" regarding the significance of prescribed anxiety medication not relied upon by Judge Watson; (2) she failed to address Mr. Dicastando's argument a combination of anxiety disorder and chronic pain caused difficulty with concentration and completing tasks; and (3) she erred in finding even if Judge Watson erred in determining his anxiety is non-severe, the error is harmless because Judge Watson proceeded through the remaining steps of the sequential analysis and considered the combined effects of all his impairments, severe or non-severe in her residual functional capacity analysis.[119] We disagree with Mr. Dicastanado and overrule his objections.

### 1. Judge Heffley did not impermissibly refer to portions of the record not relied on by Judge Watson.

Judge Heffley found substantial evidence supported Mr. Dicastanado's anxiety disorder is non-severe. Judge Heffley referred to two pieces of record evidence Mr. Dicastanado now asserts Judge Watson did not cite: (1) Mr. Dicastanado did not include anxiety disorder as a disabling condition in his application for benefits; and (2) treatment of the anxiety disorder included a once daily pill keeping his anxiety in "fair control."[120] Mr. Dicastanado argues Judge Heffley erred in referring to these portions of the record because Judge Watson did not rely on them.  He relies on his reading of lessons from our Court of Appeals' decision in *Fargnoli v. Massanari*.[121] We are not persuaded by his reading.

In *Fargnoli*, our Court of Appeals reviewed whether substantial evidence supported an administrative law judge's finding the claimant is not disabled when the administrative law judge ignored contradictory record evidence from the claimant's treating physicians.[122] Judge

Newcomer, recognizing the administrative law judge's failure to consider all relevant and probative evidence, attempted to "rectify this effort by relying on medical records found in its own independent analysis, and which were not mentioned by the [administrative law judge]."[123] Our Court of Appeals found Judge Newcomer's reliance on record evidence not cited by the administrative law judge violated the Supreme Court's teaching in *SEC v. Chenery Corporation*. In *Chenery,* the Court held "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."[124] "The major purposes of the *Chenery* doctrine are to allow an agency to consider a matter within its realm of expertise in the first instance and to ensure that we have a reasoned decision to review. Neither purpose would be served by requiring remand to the agency 'when it would be an idle and useless formality.'"[125]

Following *Fargnoli*, district courts within this Circuit generally recognize *Fargnoli* restricts our review of record evidence "to establish an alternative rational for affirming the [administrative law judge's] decision."[126] For example, in *Jones v. Astrue*, Judge Gardner sustained the claimant's objection to the magistrate judge's report and recommendation relying on record evidence not cited by the administrative law judge to find the claimant's narcolepsy improved with medication and is not a severe impairment.[127] Judge Gardner found *Fargnoli* "squarely foreclosed" his consideration of evidence contained in the record but not mentioned by the administrative law judge when determining whether substantial evidence supported the administrative law judge's decision.[128] Judge Gardner agreed with Judge Ambrose's reasoning and distinguished other cases from district courts in this circuit considering such evidence.[129] Judge Gardner explained while "a court may review *evidence* contained in the record in order to trace the path of the [administrative law judge's] reasoning, *Fargnoli* does not permit the judicial

substitution of an otherwise adequate *rationale* justifying affirmance for the rationale actually reflected in the [administrative law judge's] decision."[130]

The *Chenery* doctrine does not apply here. We do not have a situation where Administrative Law Judge Watson failed to explain her reasoning leaving us without a reasoned decision to review. Mr. Dicastanado instead argues Judge Heffley considered two things Judge Watson did not, neither of which runs afoul of the *Chenery* doctrine: (1) Mr. Dicastanado did not include anxiety disorder as a disabling condition in his application for benefits; and (2) treatment of the anxiety disorder included a once daily pill keeping his anxiety in "fair control."

First, Mr. Dicastanado is incorrect. Judge Watson specifically noted Mr. Dicastanado's initially alleged disability due to bilateral carpel tunnel syndrome, neck herniation, muscle atrophy, cervical herniation, and diabetes.[131] Although she did not specifically state Mr. Dicastanado failed to allege anxiety disorder as a disabling condition in his initial application, she specifically noted the conditions he initially identified which did not include anxiety disorder. We do not see this as error. It is also not true Judge Watson failed to mention prescribed medication for anxiety keeping it in "fair control." Judge Watson specifically referred to the medical record from his internal medicine provider showing the prescription of a 50 mg dose of quetiapine for anxiety noted upon examination as in "fair control."[132] Judge Heffley did not impose her own "lay opinion about the significance" of the quetiapine dosage; Judge Watson specifically referred to the medical record where this evidence appears.

We reject Mr. Dicastanado's argument based on our reading of *Fargnoli*. We read *Fargnoli* to prohibit us from relying on medical records found in our own independent analysis to cure an administrative law judge's ***failure to consider*** all relevant and probative evidence leaving us to wonder if the administrative law judge's findings are supported by substantial evidence.

Administrative Law Judge Watson did not fail to consider Mr. Dicastanado's initial application. She specifically referred to his initial claim of disability.[133]

Even if we found *Fargnoli* applicable today, other evidence in the record cited and relied upon by Judge Watson substantially supports her finding Mr. Dicastanado's anxiety order is not a severe impairment and "capable of providing meaningful judicial review."[134] We are persuaded by Judge Diamond's reasoning in *McBeth v. Colvin* rejecting a *Chenery/Fargnoli* challenge. In *McBeth*, the claimant argued the magistrate judge referred to records of a medical evaluation not explicitly cited by the administrative law judge.[135] Judge Diamond overruled the claimant's objection to the magistrate judge's report and recommendation finding the administrative law judge cited some of the evidence in her report. And, "for the evidence not explicitly cited by the [administrative law judge] … there was ample other evidence in the record … that undermined [medical provider's] assessment – including his own progress notes, which the [administrative law judge] explicitly cited."[136] Judge Diamond found "the [administrative law judge's] decision to discredit [medical provider] is thus supported by substantial evidence and 'capable of providing meaningful judicial review'" and overruled claimant's objection.[137]

Mr. Dicastanado's objection is similarly without merit. Administrative Law Judge Watson recognized Mr. Dicastanado reported problems paying attention and completing tasks to his internist and his internist prescribed medication to manage his anxiety disorder. Judge Watson noted while clinical examination findings in the record showed some reports of anxious and depressed mood, the records also showed findings of good insight, good judgment, and normal memory. She concluded the record as a whole does not support mental limitations.[138] Judge Watson's findings are supported by substantial evidence and are conclusive. Mr. Dicastanado simply disagrees with Judge Watson but this "falls well short of demonstrating that any reasonable

adjudicator would be compelled to reject that finding."[139] We overrule Mr. Dicastanado's objection.

### 2. Judge Heffley did not fail to address Mr. Dicastanado's argument a combination of his anxiety disorder and chronic pain caused him difficulty with concentration and completing tasks.

Mr. Dicastanado next objects arguing Judge Heffley failed to address his argument a combination of his anxiety disorder and chronic pain caused him difficulty with concentration and completing tasks.[140] The record does not support his objection.

Mr. Dicastanado cites to the section of his brief arguing Judge Watson erred by failing to include mental limitations in the residual functional capacity determination.[141] He argues Judge Watson did not engage in a full or proper evaluation of the record evidence. He attributes Judge Watson's alleged failure to fully or properly evaluate the record evidence to an assertion – without citation to authority – it is "not always possible to distinguish" between limitations due to mental impairments and limitations due to chronic pain.[142] He offers these observations as the entire basis for his objection Judge Heffley ignored his argument a combination of his anxiety disorder and chronic pain caused his difficulty with concentration and completing tasks.

We view this objection as another way to attack the weight of the evidence properly assessed by Administrative Law Judge Watson. At step two, the administrative law judge must determine whether the claimant has a medically determinable impairment or a combination of impairments that are severe. Judge Watson reviewed all of Mr. Dicastanado's alleged impairments and – other than disorders of the spine and degenerative joint disease – found them non-severe or not medically determinable as, among other reasons, responsive to treatment and/or cause no more than minimal vocationally relevant limitations. There is substantial evidence to support the finding Mr. Dicastanado's anxiety disorder is non-severe. Judge Watson recognized Mr. Dicastanado's

chronic pain and limited him to the reduced range of sedentary work in the residual functional capacity assessment.[143]

Judge Heffley reviewed all of Mr. Dicastanado's arguments. Judge Heffley's review, like ours, is limited: we must uphold the Commissioner's final determination unless we find it is not supported by substantial evidence in the record.[144] We overrule Mr. Dicastanado's objection.

### 3. Judge Heffley did not err in finding harmless error at step two of the sequential analysis with regard to anxiety disorder.

Judge Heffley concluded, even if Administrative Law Judge Watson erred in determining his anxiety disorder is non-severe, the error is harmless because Judge Watson proceeded through the subsequent steps of the sequential analysis and considered the combined effect of all impairments, severe or non-severe, in the residual functional capacity analysis.[145] Mr. Dicastanado objects to this conclusion. His objection fails as a matter of law and we overrule it.

Mr. Dicastanado's challenge is to Judge Watson's determination his anxiety disorder is not severe. But Judge Watson found his degenerative joint disease and disorders of the spine are severe impairments at step two of the sequential analysis. Judge Watson then proceeded to steps three, four, and five. Because she moved through the later steps, "any error at Step Two would not alter the remainder of the five-step process, much less the overall outcome. And without more, [claimant] provides no valid basis for remand."[146] Judge Watson found in Mr. Dicastanado's favor at step two. Thus any error is harmless even if she erroneously concluded his anxiety disorder is non-severe.[147]

Judge Heffley did not err in finding harmless error. But Mr. Dicastanado objects to her finding. He contends Administrative Law Judge Watson failed to include mental limitations in the residual functional capacity determination and failed to ask vocational expert Christina Beatty-Cody about his anxiety disorder. We disagree. Judge Watson specifically stated "I have carefully

considered the non-severe impairments in assessing the residual functional capacity and have found no specific functional vocational limitations beyond those outlined above."[148] Mr. Dicastanado's anxiety disorder is included in the non-severe impairments considered by Judge Watson.

Mr. Dicastanado asserts Judge Watson erred by failing to question Vocational Expert Beatty-Cody about his mental limitations. He points to his attorney's question to Vocational Expert Beatty-Cody: "if [Mr. Dicastanado] was off task 15 percent or more of the time due to pain in his neck and upper back, would he be eligible for any of the jobs you mentioned or any other jobs in the national economy?"[149] Vocational Expert Beatty-Cody responded: "No, that amount of off task behavior would be considered excessive by the employer, and it would preclude all work."[150] But his counsel asked a hypothetical. The record offers no evidence Mr. Dicastanado would be off-task for fifteen percent or more of the time due to his anxiety or the severe impairments found by Judge Watson. We overrule Mr. Dicastanado's objections.

**C. We overrule Mr. Dicastanado's constitutional claim as meritless.**

Mr. Dicastanado argues the Commissioner's decision is constitutionally invalid under the Supreme Court's teachings in *Seila Law LLC v. Consumer Financial Protection Bureau*.[151] In *Seila Law*, the Supreme Court held the structure of the Consumer Financial Protection Bureau violated separation of powers in Article II of the Constitution because the Bureau's Director could not be removed by the President except for cause.[152] Mr. Dicastanado argues the entire structure of the Social Security Administration, headed by the Commissioner, violates the separation of powers found unconstitutional in *Seila Law* and we must remand his claim for a *de novo* hearing before a new administrative law judge.[153]

The Social Security Administration concedes the statute limiting the President's authority to remove the Commissioner without good cause violates the separation of powers under *Seila Law*.[154] But the Administration argues the separation of powers issue does not entitle Mr. Dicastanado to a *de novo* review of his disability claim by a new administrative law judge. The Administration relies on the Supreme Court's decision in *Collins v. Yellen*[155] decided a year after *Seila Law*. Citing *Collins*, the Administration argues even if there is a unconstitutional statutory removal restriction, Mr. Dicastanado must still show the constitutional violation actually caused his harm and he cannot show a nexus between the denial of claim and the constitutional defect.

Judge Heffley considered Mr. Dicastanado's argument and the Administration's response and viewed the separation of powers as a standing issue. She concluded Mr. Dicastanado lacks standing to assert a constitutional challenge to the separation of powers violation because he failed to establish injury traceable to the unconstitutional removal clause of the Social Security Administration's Commissioner.[156]

Judge Heffley recommends we deny Mr. Dicastanado's request for review because he lacks standing to assert the constitutional claim. Mr. Dicastanado objects to Judge Heffley's finding he lacks standing. We disagree and overrule his objection.

    **1.   *Seila Law* and the structure of agencies violating the separation of powers.**

In its 2020 *Seila Law* decision, the Supreme Court examined the constitutionality of the Consumer Financial Protection Bureau created by Congress in the Dodd-Frank Wall Street Reform and Consumer Protection Act passed in the wake of the 2008 financial crisis.[157] Congress tasked the Bureau with implementing and enforcing financial consumer protection laws and transferred the administration of federal statutes to the Bureau, including the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Truth in Lending Act.[158] Congress also enacted

regulatory prohibitions on unfair, deceptive, and abusive acts or practices in the consumer-finance sector and authorized the Bureau to enforce these standards.[159]

We digress to describe the facts in *Seila Law* to inform our analysis. The Consumer Financial Protection Bureau investigated Seila Law, a law firm providing debt-collection legal services in 2017. The Bureau demanded the law firm produce information and documents relating to its debt collection.[160] Seila Law objected, arguing the Bureau's leadership headed by a single Director removable only for cause violates the separation of powers. Litigation ensued and the Supreme Court granted certiorari to address the constitutionality of the Bureau's structure.[161]

The Court held the Bureau's leadership by a single Director removable only for inefficiency, neglect, or malfeasance violates the separation of powers.[162] The Court explained Article II of the Constitution vests executive power in the President who must "take Care that the Laws be faithfully executed."[163] The President's authority derived from Article II includes the ability to remove executive officials, a long-standing construction of the President's removal power.[164] The Court had long held the Framers in Article II granted the President both the power of appointment and removal of executive officers and "'to hold otherwise … would make it impossible for the President … to take care that the laws be faithfully executed.'"[165] In the history of its jurisprudence, the Court recognized only two exceptions to the President's unrestricted removal power: (1) Congress may give for-cause removal protections to a multi-member body of experts, balanced along partisan lines, performing legislative and judicial functions and not executive powers; and (2) the removal of inferior officers with limited duties and no policymaking or administrative authority. These two exceptions "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power."[166]

Against this backdrop, the Court held the Bureau's structure – a single Director, insulated from removal except for cause, and serving a term longer than the President's term – violates the separation of powers.[167] The Court then turned to the appropriate remedy. The Court held the section of the statute providing unconstitutional removal protection is severable from other provisions of the Dodd-Frank Act establishing the Bureau and remanded the case to the Court of Appeals to consider whether the civil investigative demand by the Bureau is validly ratified.[168]

### 2. The Supreme Court's 2021 *Collins v. Yellen* decision: standing and remedy.

We are further guided by the Supreme Court's decision in *Collins v. Yellen* last year. In *Collins*, a group of shareholders challenged actions taken by the Federal Housing Finance Agency arguing, in part, the Agency's structure violated the separation of powers as held in *Seila Law*.[169] The Court agreed, finding the for-cause removal restriction of the director of the Agency violated the separation of powers, citing *Seila Law* as "all but dispositive."[170] But before addressing the merits of the constitutional challenge, the Court examined whether the shareholders had standing to bring their constitutional claim.[171] In the context of a separation of powers challenge, "any aggrieved party with standing may file a constitutional challenge."[172] And to establish standing, a plaintiff must show he suffered an "injury in fact … fairly traceable" to the defendant's conduct and "would likely be 'redressed by a favorable decision.'"[173] "Traceability" is determined by "whether the plaintiff[']s injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged."[174]

The Court ultimately determined the shareholders enjoyed Article III standing. It then turned to question of the appropriate relief.[175] The shareholders argued the challenged Agency action must be "completely undone."[176] The Court rejected this argument. It reasoned the Agency's directors who took the challenged action were properly "*appointed* [and] [a]lthough the

statute unconstitutionally limited the President's authority to *remove* the confirmed directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the [Agency] in relation to the [challenged action] as void."[177]

The Court distinguished its 2018 decision in *Lucia v. SEC*,[178] challenging a "Government actor's exercise of power that the actor did not lawfully possess."[179] An agency director who does not lawfully have power to act in the first place is different from agency action by a director whose removal by the President is unconstitutionally limited. The Court found the shareholders in *Collins* "read far too much" into *Seila Law*.[180] The Court remanded the case to determine whether the shareholders' claim the unconstitutional removal provision inflicted harm.

### 3. *Seila Law* and *Collins* applied in the Social Security context.

The Commissioner argues Mr. Dicastanado cannot show the required nexus between the unconstitutional removal provision in the Social Security Act and the denial of his benefits. The Commissioner argues the constitutionally defective removal issue is unlike Appointments Clause defects found unconstitutional in *Lucia* where the Supreme Court held administrative law judges of the Securities and Exchange Commission are "officers" within the meaning of the Appointments Clause in Article II, Section 2, Clause 2 of the Constitution. Appointment of administrative law judges by the Commission's staff rather than the President, court of law, or head of a department violated the Appointments Clause. The Court held the appropriate remedy is a new hearing before a "properly appointed official."[181]

Mr. Dicastanado argues he is entitled to a *de novo* hearing before a new administrative law judge, citing *Lucia*. But we are not concerned with the Judge Watson's appointment here. Mr. Dicastanado concedes this is ***not*** an Appointments Clause challenge.[182] The issue here is the

unconstitutional limit on the President's authority to remove the Commissioner. As noted, the Commissioner concedes the Social Security Act, 42 U.S.C. § 902(a)(3), violates the separation of powers to the extent it is construed as limiting the President's authority to ***remove*** the Commissioner without cause.[183] But this principle does not mean Mr. Dicastanado is entitled to a *de novo* hearing before a new administrative law judge; this is not a question of an unconstitutional appointment or the administrative exhaustion of an Appointments Clause issue.[184] As explained by the Court in *Collins*, "[s]ettled precedent also confirms that the unlawfulness of the removal provision does not strip the [Agency] Director of the power to undertake the other responsibilities of his office, including implementing the [challenged action]."[185]

Mr. Dicastanado addressed *Collins* in his reply brief.[186] He cites a July 9, 2021 article by a reporter for the Federal News Network quoting an unnamed "White House official":

> "Since taking office, Commissioner Saul has undermined and politicized Social Security disability benefits, terminated the agency's telework policy that was utilized by up to 25% of the agency's workforce, not repaired SSA's relationships with relevant federal employee unions including in the context of COVID-19 workplace safety planning, reduced due process protections for benefits appeals hearings, and taken other actions that run contrary to the mission of the agency and the President's policy agenda[.]"[187]

Mr. Dicastanado contends this news report shows "the policy adjudication framework and processes established by [Commissioner] Paul were the primary and lead reasons for President Biden's dissatisfaction with this unaccountable executive branch official"; "President Biden believed that Commissioner Saul had infringed upon the constitutional due process rights of disability applicants like this Plaintiff" and "[m]ost importantly, President Biden emphasized that Commissioner Saul had engaged in these very activities '[s]ince taken office' in 2019."[188] He concludes "it is unmistakable that President Biden would have fired Commissioner Saul

immediately upon taking office had he believed it was legal" and "President Biden would have fired Commissioner Saul immediately upon taking office had he believed it was legal."[189]

Mr. Dicastanado's reliance on an unnamed "White House official" in a news report is wildly speculative. It is unavailing. It does not meet his burden. Mr. Dicastanado must show some nexus between the unconstitutional restriction on the President's authority to remove the Commissioner to Judge Watson's denial of his disability claim. Judge Heffley thoroughly analyzed decisions from our colleagues uniformly rejecting the application of *Seila Law* to administrative law judge decisions in the context of injury and standing.[190] We also found numerous decisions by our colleagues in this Circuit rejecting the relief Mr. Dicastanado seeks in the context of Social Security denial of benefits.[191] Mr. Dicastanado fails to articulate an injury caused by Commissioner Saul exercising authority he retained under the unconstitutional removal clause. He must show harm caused by the unconstitutional removal restriction.[192]

Mr. Dicastanado also claims some undefined injury in his Reply Brief arising from his view the Commissioner denied him a "valid adjudication process" or "constitutionally valid determination" from the Appeals Council.[193] We cannot make sense of his injury giving him standing. He suffers no harm in his adjudicative process which could not be waived as in *Carr* and he offers no basis to find Judge Watson's determination and Appeals Council's review is somehow affected by the President's authority to remove the Commissioner. Mr. Dicastanado essentially argues standing without concrete injury arising from his view of a constitutional defect relating to the President's powers relative to the Commissioner.

In *Collins*, the unlawful removal restriction "would clearly cause harm" where, for example: "[t]he President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal" or "[t]he President had

made a public statement expressing displeasure with actions taken by a Director and had asserted

that he would remove the Director if the statute did not stand in the way."[194]

     Mr. Dicastanado fails to show a basis for us to apply *Seila Law*. We deny his request for

remand for *de novo* review by a new administrative law judge.

## III.  Conclusion

     We overrule Mr. Dicastanado's objections, approve and adopt Judge Heffley's report and

recommendation, and deny Mr. Dicastanado's request for review.

---

[1] 140 S. Ct. 2183, 207 L. Ed. 2d 494 (2020).

[2] 141 S. Ct. 1761, 210 L. Ed. 2d 432 (2021).

[3] Administrative Record ("R") 256. The scapula is "the flat, triangular bone in the back of the shoulder …" also called "shoulder blade." Dorland's Illustrated Medical Dictionary 1646 (33rd ed. 2020). Before his work as an airplane fueler, Walter Dicastanado worked as a dispatcher for a cab company, a valet, an airplane ramp agent, a janitor, security guard, and various positions in food service. R. 205.

[4] R. 191.

[5] R. 163, 189, 195. Mr. Dicastanado is currently forty-nine-years-old making him a "younger individual" at the time of his alleged disability onset date 20 C.F.R. § 404.1563 ("Your age as a vocational factor"). Mr. Dicastanado was forty-five-years-old on October 19, 2018, the alleged onset of disability date. The Social Security regulations define a "younger person" as: "If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45–49 are more limited in their ability to adjust to other work than persons who have not attained age 45 …" 20 C.F.R. § 404.1563(c).

[6] R. 76–87, 105–08.

[7] R. 109.

[8] R. 89–100, 110–14.

[9] R. 115–17.

[10] R. 39–75. ALJ Watson held the hearing by telephone due to the COVID-19 pandemic. R. 41.

---

[11] R. 40.

[12] R. 23–35.

[13] R. 28–33.

[14] An Administrative Law Judge applies the five-step process until a finding of "disabled" or "not disabled" is reached. "The sequence requires an ALJ to assess whether a claimant: (1) is engaging in substantial gainful activity; (2) has a severe 'medically determinable' physical or mental impairment or combination of impairments; (3) has an impairment or combination of impairments that meet or equal the criteria listed in the social security regulations and mandate a finding of disability; (4) has the residual functional capacity to perform the requirements of [his] past relevant work, if any; and (5) is able to perform any other work in the national economy, taking into consideration [his] residual functional capacity, age, education, and work experience. *Edinger v. Saul*, 432 F. Supp. 3d 516, 523, n. 4 (E.D. Pa. 2020) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)).

[15] 20 C.F.R. § 404.1520(a)(4)(i).

[16] R. 25.

[17] 20 C.F.R. § 404.1520(a)(4)(ii).

[18] *Id.* § 404.1520(c).

[19] *Newell v. Comm'r Soc. Sec.*, 347 F.3d 541, 546–47 (3d Cir. 2003) (*citing Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir.1986)).

[20] *Newell*, 347 F.3d at 346 (citing SSR 85–28, 1985 SSR LEXIS 19, at *6–7).

[21] *Newell*, 347 F.3d at 346–47 (citing *Smolen*, 80 F.3d at 1290).

[22] R. 25.

[23] *Id.*

[24] R. 25–27 (citing 20 C.F.R. §§ 404.1509, 404.1513(a)).

[25] 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 404.1525, 404.1526.

[26] *Id.* § 404.1520(a)(4)(iii).

[27] *Id.* § 404.1520(a)(4)(iv).

[28] R. 27.

[29] 20 C.F.R. §§ 404.1520(e), 404.1545.

[30] 20 C.F.R. §§ 404.1520(a)(4)(iv), (f).

[31] R. 28–33.

[32] *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687–88 (3d Cir. 2020) (citing 20 C.F.R. § 404.1520(a)(4)(v)).

[33] R. 33.

[34] R. 34.

[35] R. 71–75.

[36] R. 34.

[37] R. 35.

[38] R. 244–47.

[39] R. 1–4.

[40] ECF Doc. Nos. 1, 11.

[41] ECF Doc. No. 11.

[42] 140 S. Ct. 2183, 207 L. Ed. 2d 494 (2020).

[43] ECF Doc. No. 17 at 4–13.

[44] *Id.* at 13–19.

[45] *Id.* at 20.

[46] ECF Doc. No. 18.

[47] 28 U.S.C. § 636(b)(1).

[48] *Id.*

[49] *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).

[50] 42 U.S.C. § 405(g); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

---

[51] *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154, 203 L.Ed. 2d 504 (2019) (citing *T-Mobile South, LLC, v. Roswell*, 574 U.S. 293, 301 (2015)).

[52] *Id*. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (emphasis deleted)).

[53] *Id.* (citations omitted).

[54] *Davis v. Kijakazi*, No. 20-4867, 2022 WL 1460356, at *3 (E.D. Pa. May 9, 2022) (citing 42 U.S.C. § 405(g)).

[55] *Davis*, 2022 WL 1460356, at *3 (citing *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) and *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 506 (3d Cir. 2009)). *See also Sisco v. Comm'r Soc. Sec.*, 840 F. App'x 685, 688 (3d Cir. 2020) (the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder") (quoting *Williams v. Sullivan*, 970 F. 2d 1178, 1182 (3d Cir. 1992)).

[56] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119–20 (3d Cir. 2000).

[57] *Davis*, 2022 WL 1460356 at * 3 (quoting *Plummer*, 186 F.2d at 429).

[58] R. 28.

[59] ECF Doc. No. 11 at 3; ECF Doc. No. 18 at 1–4.

[60] *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n. 1 (3d Cir. 1999)).

[61] *Id.* (citing *Plummer*, 186 F.3d at 429; *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

[62] R. 28.

[63] R. 27.

[64] R. 198.

[65] ECF Doc. No. 18 at 2, citing R. 198, 199, 200.

[66] R. 28 (citing R. 202).

[67] R. 28–29 (citing Hearing Testimony). *See* R. 58–59, 66– 68.

[68] 20 C.F.R. § 404.1529.

[69] R. 28–29.

[70] ECF Doc. No. 18 at 3, citing R. 256–57, 287, 290, 294, 298, 303, 305, 340, 486, 490.

[71] R. 29–33.

[72] ECF Doc. No. 17 at 10.

[73] R. 30. Dr. Bazel provided an addendum to his October 30, 2019 examination on November 12, 2019. R. 459. Judge Watson considered the November 12, 2019 addendum in her analysis of the residual functional capacity. *See* R. 30.

[74] R. 30 (citing R. 459–74).

[75] R. 30 (citing R. 459, 460–64, 471–74).

[76] R. 29 (citing R. 255–57).

[77] A "Spurling" test is a test for cervical radiculopathy: "The examiner presses down on the top of the head while the patient rotates the head laterally and into hyperextension; pain radiating into the upper limb ipsilateral to a rotation position of the head indicates radiculopathy." Dorland's Illustrated Medical Dictionary 1870 ( 33rd ed. 2020).

[78] R. 29 (citing R. 256). A "Speed's" test "is a physical test performed to help detect certain biceps tendon injuries, including injury to the long head of the biceps tendon, presence of [superior labrum anterior to posterior] tears or tendinopathy in your shoulder." A "Yergason's" test "is a physical test performed to help detect certain biceps tendon injuries – in particular, an injury to the long head of the biceps tendon. It can also assist in the diagnosis of a tear in your transverse humeral ligament, [superior labrum anterior to posterior] tear and biceps tendonitis." https://my.clevelandclinic.org/health/diagnostics/22705-yergasons-test#test-details (last visited June 27, 2022).

[79] R. 29 (citing R. 257). "Osseous" is defined as: "of the nature or quality of bone; bony." Dorland's Illustrated Medical Dictionary 1325 (33rd ed. 2020). "Pathology" in this context is defined as "the structural and functional manifestations of disease." *Id.* at 1375.

[80] R. 29 (citing  R. 257).

[81] R. 29–30.

[82] R. 30.

[83] R. 29–33.

[84] R. 33.

[85] R. 31.

[86] R. 31.

[87] R. 31–33.

[88] R. 31.

[89] R. 32–33.

[90] R. 32.

[91] R. 32–33.

[92] ECF Doc. No. 17 at 7–8.

[93] *Orr v. Comm'r Soc. Sec.*, 805 F. App'x 85, 88 (3d Cir. 2020) (citing *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)).

[94] *Chandler*, 667 F.3d at 363 (citing 20 C.F.R. § 404.1529(a) (internal citation omitted)).

[95] R. 30, 31.

[96] ECF Doc. No. 18 at 3–4.

[97] R. 30

[98] *Id.*

[99] *Id.*

[100] ECF Doc. No. 18 at 3.

[101] *Id.*

[102] R. 358-407.

[103] R. 483.

[104] R.483, 491.

[105] *Chandler*, 667 F.3d at 359.

[106] R. 26.

[107] 20 C.F.R. §§ 404.1520(a)(4)(ii), (c).

[108] 20 C.F.R. § 404.1520a.

[109] 20 C.F.R. § 404.1520a(b).

---

[110] 20 C.F.R. § 404.1520a(c)(3).

[111] 20 C.F.R. § 404.1520a(c)(4).

[112] 20 C.F.R. § 404.1520a(d)(1).

[113] 20 C.F.R. § 404.1520a(e)(4). *See Sisco*, 840 F. App'x at 687 (explaining the "special technique" required in mental disorder cases).

[114] 20 C.F.R., Part 404, Subpart P, Appendix 1, known as the "paragraph B" criteria. *See* R. 26.

[115] R. 27.

[116] R. 26.

[117] R. 27.

[118] ECF Doc. No. 17 at 10–13.

[119] ECF Doc. No. 18 at 4–6.

[120] ECF Doc. No. 17 at 12.

[121] 247 F.3d 34 (3d Cir. 2001).

[122] *Fargnoli*, 247 F.3d at 43–44.

[123] *Id.* at 44, n.7.

[124] *Id.* (quoting *SEC v. Chenery Corporation*, 318 U.S. 80, 87 (1943)). This is referred to as the "*Chenery* doctrine."

[125] *Byrne v. Sec'y U.S. Dep't of Homeland Sec.*, 618 F. App'x 143, 146 (3d Cir. 2015) (quoting *Li Hua Yuan v. Att'y Gen. of United States*, 642 F.3d 420, 427 (3d Cir. 2011) (internal quotation omitted)).

[126] *Jones v. Astrue*, 872 F. Supp. 2d 428, 432–33 (E.D. Pa. 2012) (quoting *Knox v. Astrue*, No. 09-1075, 2010 WL 1212561, at * 7 (W.D. Pa. Mar. 26, 2010)).

[127] *Id.* at 432. *See also Thompson v. Kijakazi*, No. 21-3568, 2022 WL 2159266, at * 5 (E.D. Pa. June 15, 2022) ("[t]his court must consider only the explanation the [administrative law judge] provides and may not search the record for evidence which might support her conclusion," citing *Fargnoli*); *Smith v. Kijakazi*, No. 21-203, 2022 WL 2048087, at * 1, n. 3 (W.D. Pa. June 7, 2022) (a reviewing court may not rely on medical records found in its own independent analysis not relied upon by the ALJ).

[128] *Jones*, 872 F. Supp. 2d at 432.

[129] *Id.* Judge Gardner declined to follow *Esposito v. Apfel*, No. 99-771, 2000 WL 218119 (E.D. Pa. Feb. 24, 2000), *Hook v. Bowen*, 677 F. Supp. 305, 306 (M.D. Pa. 1988), and *Beckett v. Leavitt*, 555 F.Supp.2d 521, 526 (E.D. Pa. 2008), relying on record evidence not cited by the ALJ.

[130] *Jones*, 872 F. Supp. 2d at 432 (quoting *Knox*, 2010 WL 1212561 at * 7) (emphasis in original).

[131] R. 28.

[132] R. 26 (citing R. 483, 490). Quetiapine, known by its brand name Seroquel, is "[u]sed in adults for the treatment of schizophrenia, mania associated with bipolar I disorder, bipolar depression, maintenance of bipolar I disorder, and as an adjunct to antidepressants for treatment-resistant major depressive disorder[.]" https://www.pdr.net/drug-summary/Seroquel-quetiapine-fumarate-2185.6108?mode=preview (last visited June 21, 2022).

[133] R. 28.

[134] *McBeth v. Colvin*, No. 12-3583, 2013 WL 6061364, at * 5 (E.D. Pa. Nov. 18, 2013) (quoting *Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146 (3d Cir.2007)).

[135] *Id.* at *4.

[136] *Id.*

[137] *Id.*

[138] R. 26–27.

[139] *Sisco*, 840 F. App'x at 688 (citing *Nasrallah v. Barr*, 140 S.Ct. 1683, 1692, 207 L. Ed. 2d 111 (2020)).

[140] ECF Doc. No. 18 at 6.

[141] ECF Doc. No. 11 at 14–15.

[142] ECF Doc. No. 11 at 14.

[143] R. 30, 32.

[144] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (citing 42 U.S.C. § 405(g); *Plummer*, 186 F.3d at 427).

[145] ECF Doc. No. 17 at 13.

[146] *Orr*, 805 F. App'x at 88.

[147] *Salles v. Comm'r Soc. Sec.*, 229 F. App'x 140, 145, n .2 (3d Cir. 2007) (citing *Rutherford* , 399 F.3d at 553).

[148] R. 31.

[149] R. 74.

[150] *Id.*

[151] 140 S. Ct. 2183, 207 L. Ed. 2d 494 (2020).

[152] Article II of the Constitution vests executive power in "a President of the United States of America" who "shall take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1, § 3.

[153] ECF Doc. No. 11 at 18.

[154] ECF Doc. No. 15 at 14.

[155] 141 S. Ct. 1761, 210 L. Ed. 2d 432 (2021).

[156] ECF Doc. No. 17 at 13–19.

[157] *Seila Law*, 140 S.Ct. at 2193.

[158] *Id.* at 2193.

[159] *Id.*

[160] *Id.* at 2194.

[161] *Id.* at 2194–95.

[162] *Id.* at 2197.

[163] *Id.* (quoting Art. II, § 1, cl. 1, § 3).

[164] *Id.* at 2197–98.

[165] *Id.* (quoting *Myers v. United States*, 272 U.S. 52, 47 S. Ct. 21, 41, 71 L. Ed. 160, 164 (1926)).

[166] *Id.* at 2199–200 (citation omitted).

[167] *Id.* at 2201–07.

[168] *Id.* at 2210–11.

[169] *Collins*, 141 S.Ct. at 1780, 1778–81, 1783–84.

[170] *Id.* at 1783.

[171] *Id.* at 1778.

[172] *Id.* at 1780.

[173] *Id.* at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[174] *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

[175] *Id.* at 1787.

[176] *Id.*

[177] *Id.* (emphasis in original).

[178] 138 S. Ct. 2044, 201 L. Ed. 2d 464 (2018).

[179] *Collins*, 141 S. Ct. at 1788.

[180] *Id.*

[181] *Lucia,* 138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 183 (1995)).

[182] ECF Doc. No. 16 at 5.

[183] ECF Doc. No. 15 at 12 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).

[184] *See  Carr v. Saul*, 141 S. Ct. 1352, 209 L. Ed. 2d 376 (2021). In *Carr*, the Supreme Court resolved a Circuit split regarding the administrative exhaustion of an Appointments Clause challenge to the authority of an administrative law judge. *Id.* at 1357. The Court recognized its decision in *Lucia* holding administrative law judges within the Securities and Exchange Commission had been unconstitutionally appointed in violation of the Appointments Clause. *Id.* at 1357. A violation of the Appointments Clause – ***not*** the separations of power clause – vacates the decision of an improperly appointed administrative law judge and requires a new review by a properly appointed adjudicator. *Id.* The question for the Court in *Carr* is whether a claimant must raise an Appointment Clause challenge to an administrative law judge or the Appeals Council in a Social Security proceeding. The Court held there is no administrative exhaustion requirement to an Appointments Cluse challenge. *Id.* at 1358–62.

[185] *Collins*, 141 S. Ct. at 1788, n. 23 (citing *Seila Law*, 140 S. Ct. at 2207–11). The Commissioner explains at the time of ALJ Watson's determination in October 2020, Andrew Saul served as Commissioner. ECF Doc. No. 15 at 18. President Biden removed Commissioner Saul from his

position in July 2021. *Id.* President Biden appointed Dr. Kilolo Kijakazi as the Acting Commissioner of the Social Security Administration in July 2021. https://www.ssa.gov/agency/commissioner/ (last visited June 23, 2022).

[186] ECF Doc. No. 16.

[187] ECF Doc. No. 16 at 7.

[188] *Id.*

[189] *Id.* at 8.

[190] *See* ECF Doc. No. 17 at 15–19 (collecting cases).

[191] *Ford v. Kijakazi*, No. 21-1432, 2022 WL 1203731, at *6, n. 4 (E.D. Pa. Apr. 22, 2022) (Rice, MJ) (collecting cases); *Andino v. Kijakazi*, No. 21-2852, 2022 WL 1135010, *6 (E.D. Pa. Apr. 18, 2022) (Reid, MJ) (collecting cases); *Adams v. Kijakazi*, No. 20-3591, 2022 WL 767806, *10–11 (E.D. Pa. Mar. 14, 2022) (Hey, MJ); *Burrell v. Kijakazi*, No. 21-3662, 2022 WL 742841, at *5 (E.D. Pa. Mar. 10, 2022) (Reid, MJ); *High v. Kijakazi*, No. 20-3528, 2022 WL 394750, at *5–6 (E.D. Pa. Feb. 9, 2022) (Wells, MJ.); *Wicker v. Kijakazi*, No. 20-4771, 2022 WL 267896, at *8–10 (E.D. Pa. Jan. 28, 2022) (Heffley, MJ.) (collecting cases); *Kowalski v. Kijakazi*, No. 20-1783, 2022 WL 526094, at *9 (M.D. Pa. Feb. 22, 2022) (Mehalchick, CMJ); *Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510, at *3–5 (D.N.J. Jan. 7, 2022) (Vazquez, J.).

[192] *Collins*, 141 S. Ct. at 1789.

[193] ECF Doc. No. 16 at 5.

[194] *Id.*